UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GSS GROUP Ltd. (a/k/a GLOBAL SECURITY SEALS GROUP Ltd.)<br>Akara Building<br>24 De Castro Street<br>Wickhams Cay 1<br>Roadtown<br>Tortola, British Virgin Islands,<br><br>                Petitioner,<br><br>    -and-<br><br>THE REPUBLIC OF LIBERIA<br>c/o<br>Ministry of Foreign Affairs<br>Mamba Point<br>P.O. Box 10-9002<br>1000 Monrovia-10<br>Liberia<br><br>                Respondent. | Civil Action No. _____<br><br><br><br>**PETITION FOR AN ORDER CONFIRMING FOREIGN ARBITRAL AWARD** |

Petitioner, GSS Group Ltd. (a/k/a Global Security Seals Group Ltd.) ("GSS"), by and through its undersigned counsel, alleges as follows:

1. GSS brings this proceeding in accordance with the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"), codified in Chapter 2 of the Federal Arbitration Act, 9 U.S.C. § 201 *et seq.*, to confirm a May 7, 2009 arbitration award (the "Award") issued in London, England in favor of GSS and against the National Port Authority of Liberia (the "NPA of Liberia"). Because the Republic of Liberia ("Liberia") is responsible for the actions of the NPA of Liberia, the Award should be confirmed and enforced against Liberia.

## THE PARTIES

2. Petitioner GSS is a company registered under the laws of the British Virgin Islands, with its principal place of business at Akara Building, 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands. GSS was incorporated in the British Virgin Islands as Wagener International Limited but changed its name to GSS Group Ltd. on March 19, 2004.

3. Respondent Liberia is a foreign state as defined in 28 U.S.C. § 1603(a) located in Western Africa.

## JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. §§ 1330(a), 1331, and 1605(a)(6).

5. This Court has personal jurisdiction over Liberia pursuant to 28 U.S.C. § 1330(b).

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(f).

## FACTUAL BACKGROUND

7. On June 9, 2005, GSS and the NPA of Liberia signed an agreement entitled "BOT Project Agreement" (hereinafter "the June Agreement") to construct and operate a new container park at the Freeport of Monrovia, Liberia. The June Agreement is annexed as Exhibit 1.

8. On July 4, 2005, the NPA of Liberia informed GSS that the Liberian Contract and Monopolies Commission ("CMC") required the June Agreement to be temporarily stopped and put out to competitive bidding. Although GSS had a binding and probated agreement with the NPA of Liberia, it was willing to renegotiate the commercial terms of the June Agreement to satisfy CMC's concerns. As a result, on August 22, 2005, the parties signed a new and amended

2

contract for the construction, operation and transfer of the container park at the Freeport of Monrovia ("the August Agreement"). The August Agreement is annexed as Exhibit 2.

9. In late October, 2005, at the request of the NPA of Liberia, GSS once again agreed to amend its existing August Agreement with the NPA of Liberia. The Amendment to the August Agreement, negotiated with the NPA of Liberia with the knowledge and approval of the CMC, was executed on November 28, 2005. The Amended August Agreement is annexed as Exhibit 3.

10. The Amended August Agreement contains, in Article VIII, the following agreement to submit to arbitration in London, England any disputes that arise under the contract:

> 8.1 In the event of its formation, validity, interpretation, performance, termination, enforcement or breach for which an amicable settlement can not be achieved by and between the parties, they shall result to arbitration. This arbitration shall be governed and interpreted in accordance with the laws of England and Wales. Any disputes which may arise between the parties, out of or in connection with this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration. . . The arbitration shall be held in London England and shall be conducted in the English Language.
>
> 8.2 The Chairperson shall have sole jurisdiction to choose the appropriate procedures and evidence rules to be applied in the arbitration but will be obligated to provide reason for his verdict.

### THE ARBITRATION PROCEEDINGS AND THE ARBITRAL AWARD

11. On March 15, 2006, as a result of the NPA of Liberia's breach of contract, GSS submitted a letter to the NPA of Liberia, pursuant to Article VIII of the Amended August Agreement, demanding arbitration of its claim for all breach-of-contract damages and losses. GSS's March 15, 2006 letter is annexed as Exhibit 4. On June 23, 2006, in accordance with Article VIII, GSS appointed the Honourable Lord Mustill as its party-appointed arbitrator and asked the NPA of Liberia to appoint its arbitrator within 14 days. After the NPA of Liberia

3

failed to appoint its arbitrator as requested, GSS, on August 22, 2006, requested that Lord Mustill accept appointment as sole arbitrator in accordance with Section 17(2) of the Arbitration Act of 1996. On September 4, 2006, Lord Mustill accepted appointment as sole arbitrator.

12. On October 11, 2006, James E. Pierre, Counsellor-at-Law with Pierre, Tweh & Associates, Palm Hotel Building, Broad & Randall Streets, P.O. Box 10-2536, 1000 Monrovia 10, Liberia, counsel for the NPA of Liberia, informed GSS's London solicitors and Lord Mustill that the NPA of Liberia did not agree to submit to the arbitration. Thereafter, GSS's London solicitors copied Mr. Pierre on their communications with Lord Mustill, and Mr. Pierre himself communicated with Lord Mustill concerning the arbitration proceedings. As a result, the NPA of Liberia was kept apprised of the arbitration proceedings before Lord Mustill.

13. On March 3, 2008, Lord Mustill issued a Ruling on Jurisdiction affirming his jurisdiction to rule upon all relevant issues. That Ruling on Jurisdiction is annexed as Exhibit 5. On March 6, 2008, Lord Mustill issued a Further Ruling affording the NPA of Liberia until March 28, 2008 to defend GSS's claim. That Further Ruling is annexed as Exhibit 6. The NPA of Liberia did not respond to the Further Ruling. On April 30, 2008, GSS asked Lord Mustill to issue an award.

14. On June 26, 2008, Lord Mustill issued a Partial Award determining the liability issues, declaring that the NPA of Liberia is liable to GSS for breach of the Amended August Agreement, and affirming that the NPA of Liberia is liable for damages in relation to the breach. The Liability Award is annexed as Exhibit 7.

15. On May 7, 2009, Lord Mustill issued a Second Partial Award, determining the breach-of-contract damages, and directing the NPA of Liberia to pay GSS the sum of $44,347,260. The Award is annexed as Exhibit 8. It remains unsatisfied.

16. The Award is final and binding, and may be enforced.

4

## LIBERIA'S RELATIONSHIP WITH THE NPA OF LIBERIA

A. <u>The Liberian Government Exercises Plenary Control Over The NPA Of Liberia.</u>

17. National Port Authority Act of Liberia ("NPAA") governs the appointment of the NPA of Liberia's board of directors. In accordance with the NPAA, the NPA of Liberia's 15-member board of directors is wholly dominated and controlled by the President of Liberia.

18. Three board members are government ministers appointed by the President who hold their offices at the pleasure of the President pursuant to the Constitution of the Republic of Liberia. A fourth director is appointed by the board which is controlled by the President. An additional seven directors are members at large appointed by the President. The final four directors are representatives of users of the ports in Liberia who serve as directors subject to the approval and appointment of the President. The President also appoints the board chairman who casts the deciding vote in the event of a tie.

19. A Concession Agreement dated August 17, 2010 between the NPA of Liberia and APM Terminals Liberia Ltd. ("APM"), which is similar in purpose and therefore analogous to the June Contract between the NPA of Liberia and GSS, further demonstrates the Liberian government's control over the actions of the NPA of Liberia.

20. The Concession Agreement is the product of the Liberian government's "Port Sector Reform Program" and the efforts of the "Inter-Ministerial Committee for the Freeport of Monrovia Concession."

21. The Concession Agreement is executed on behalf of the NPA of Liberia by the Chairman of the NPA of Liberia's board of directors, the NPA of Liberia's managing director, the Minister of Finance, the Chairman of the National Investment Commission, the Minister of Justice, and H.E. Ellen Johnson-Sirleaf, Liberia's President.

22. The Concession Agreement directs that notices in respect of the NPA of Liberia be provided to the NPA of Liberia, the Minister of Finance, the Chairman of the National Investment Commission, and the Minister of Justice.

B. <u>The NPA Of Liberia's Economic Interests Are Liberia's Economic Interests</u>.

23. The port infrastructure managed by the NPA of Liberia subject to government oversight is critically important to Liberia's national economic well-being. By managing Liberia's port infrastructure, the NPA of Liberia implements national policies essential to Liberia's economy, subject to the Liberian government's supervision and control.

24. To ensure that the NPA of Liberia fulfills the charter spelled out in the NPAA, and implements Liberia's national policies, the Liberian government is directly involved in and oversees the NPA of Liberia's management and operations.

25. The NPA of Liberia's managing director issues annual reports to the President describing, among other things, the NPA of Liberia's actions to fulfill its charter on Liberia's behalf.

26. According to the NPA of Liberia's Annual Report for 2008, the Liberian government, through the Ministry of Finance, absorbed the then-existing debt burden of the NPA of Liberia, amounting to $32.2 million. While the NPA of Liberia's Annual Report for 2009 mentions the Award amounting to $44,347,260 in favor of GSS and against the NPA of Liberia, the NPA's Annual Report for 2010 does not mention that debt, indicating that the Liberian government has absorbed that debt burden just as it had absorbed the NPA of Liberia's debt burden in 2007-2008.

27. That the NPA of Liberia's economic interests are inextricably the Liberian government's economic interests is also reflected in the fact that under the NPAA all of the NPA

6

of Liberia's rights and properties will vest in Liberia should the Liberian legislature terminate the NPA of Liberia.

### C. Liberia Instructed The NPA Of Liberia To Cancel Its Contract With GSS.

28. In addition to the Liberian government's control of the NPA of Liberia's board of directors and senior management, and its shared economic interests with the NPA of Liberia, the Liberian government's control over the NPA of Liberia is demonstrated by the manner in which the NPA of Liberia's management cancelled the Amended August Agreement at Liberia's direction.

29. GSS and the NPA of Liberia entered into the Amended August Agreement under the regime of the National Transitional Government of Liberia ("NTGL"), which was created by the 2003 Peace Agreement that ended the Liberian civil war. The NTGL governed Liberia until a duly elected government took office in January 2006.

30. In 2005, the International Contact Group for Liberia ("ICGL"), an international group with responsibilities for monitoring and enforcing the Peace Agreement, reviewed the NPA of Liberia's Amended August Agreement with GSS. The ICGL's actions were followed later by those of the Governance and Economic Management Assistance Program ("GEMAP").

31. On October 19, 2005, the ICGL's co-chairmen wrote to Charles G. Bryant, Chairman of the NTGL, raising concerns over the bidding process that led to the Amended August Agreement. Ultimately, GEMAP's Economic Governance Steering Committee ("EGCS") concluded that the NPA of Liberia did not have authority to enter into the Amended August Agreement. Acting on the recommendations of the EGSC, on December 30, 2005, NTGL Chairman Bryant instructed Ms. Musuleng Cooper, Chairperson of the NPA of Liberia's Board of Directors, that the Amended August Agreement should be cancelled.

32. By letter dated January 26, 2006, the NPA of Liberia, acting through the new Board of Directors appointed by newly-elected President Johnson Sirleaf, notified GSS of its decision to cancel the Amended August Agreement, and confirmed the same in a letter dated February 16, 2006.

33. The NPA of Liberia cancelled the Amended August Agreement acting under the control and direction, and pursuant to the instructions, of the NTGL, and hence Liberia.

### LIBERIA MUST SATISFY THE ARBITRAL AWARD

34. The NPA of Liberia is so integral a part of Liberia's national infrastructure that it should not be treated as a juridical entity independent of Liberia. For the purpose of enforcing the Award, Liberia and the NPA of Liberia are effectively one and the same entity.

35. Alternatively, Liberia so controls the NPA of Liberia that a principal-agent relationship exists between Liberia, as principal, and the NPA of Liberia, as agent, thereby rendering Liberia obligated to satisfy the Award to the same extent as the NPA of Liberia.

36. Further alternatively, the NPA of Liberia implements Liberian national policy with the active assistance and involvement of the Liberian government, thereby rendering Liberia responsible for the NPA of Liberia's actions and hence the Award.

37. Further alternatively, Liberia directed the NPA of Liberia's management to cancel the Amended August Agreement, thereby establishing both Liberia's control over the NPA of Liberia and its obligation to satisfy the Award.

38. In all events, not enforcing the Award against Liberia would be unjust.

### CONFIRMING THE AWARD

39. GSS restates the allegations of paragraphs 1 through 38 above. Pursuant to 9 U.S.C. § 207, any party seeking to confirm a foreign arbitral award in accordance with the New

8

York Convention may do so provided that the award: (a) falls under the New York Convention; (b) was issued less than three years ago; and (c) does not fall under any exception in the New York Convention for which confirmation may be refused.

40. Under 9 U.S.C. § 202, an award falls under the New York Convention if the award arose from a commercial legal relationship. The Award here arises out of NPA of Liberia's breach of the Amended August Agreement, which established a commercial legal relationship.

41. Lord Mustill issued the Award on May 7, 2009, less than three years ago.

42. The United States and the United Kingdom are New York Convention signatories.

43. Pursuant to 9 U.S.C. § 207, "the court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified" in the New York Convention. No such grounds are applicable here.

WHEREFORE, Petitioner GSS respectfully petitions this Court for an Order:

(a) confirming the Award of May 7, 2009;

(b) granting GSS judgment against Liberia in the principal sum of $44,347,260, together with post-award interest and all costs; and

(c) granting GSS such other and further relief as the Court deems just and proper.

Dated: March 1, 2012

DLA PIPER LLP (US)

*Charles B. Wayne*

Charles B. Wayne (# 935858)
500 Eighth Street, NW
Washington, DC 20004
(202) 799-4253
(202) 799-5253 (fax)
charles.wayne@dlapiper.com

*Counsel for Petitioner GSS Group Ltd.*

9

Of Counsel:
Stanley McDermott III
David S. Wenger
1251 Avenue of the Americas
New York, New York 10020-1104
(212) 335-4790
(212) 884-8490 (fax)
stanley.mcdermott@dlapiper.com
david.wenger@dlapiper.com