06/03 2008 16 38 FAX 02078138080  ESSEX COURT CHAMBERS  ☑002/018

In the Matter of an Arbitration

Between

GLOBAL SECURITY SEALS GROUP

Claimant

-and-

NATIONAL PORT AUTHORITY

Respondent

RULING ON JURISDICTION

(3 March 2008)



GLOBAL SECURITY SEALS GROUP LIMITED

-AND-

NATIONAL PORT AUTHORITY

---

## Ruling on Jurisdiction

A. <u>Narrative.</u>

1. A claim is brought by Global Security Seals Group Limited ("GSS") against Liberia National Port Authority ("the NPA") under a written and notarised instrument dated 9 June 2005. I will call this instrument "the June Agreement", without prejudice to the contention of NPA that for various reasons it did not in reality embody a valid and enforceable contract.

2. The subject-matter of the June Agreement was the construction, outfitting and operation of a container park at the free port of Monrovia.

3. Amongst other provisions, the June Agreement stipulated as follows:

"8.1 This agreement shall be governed and interpreted solely, in accordance with the laws of England and Wales, regarding the disputes arising out of this contract. Any disputes, which may arise between the parties, out of or in connection with this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration before a single arbitrator to be agreed upon, then the arbitrator will be appointed, at the request of either party, by the President of the Law Society of England and Wales. The arbitration

-1-

shall be conducted in London England, and conducted in the English language.

8.2 The arbitrator shall have sole jurisdiction to choose the appropriate procedures and evidence rules to be applied in the arbitration but will be obligated to provide reason for his verdict."

4. GSS and its associates thereupon commenced the initial steps towards the performance of the June Agreement. On 4 July 2005, however, NPA informed GSS that the Contract and Monopolies Commission ("CMC"), an agency established by the Government of Liberia to oversee all Government contracts, had advised that the contract be halted and put on competitive bid, with a provision that GSS could compete in the bidding process.

5. GSS immediately protested, but without avail. It seems that after fruitless correspondence GSS, with the co-operation of NPA, set out to find a way in which GSS's participation in the project could be resumed as soon as possible. With this aim in view, NPA requested the approval of the Contracts and Monopolies Commission ("the CMC") for the use of Single-Source Procurement in concluding a Build Operate and Transfer Agreement with GSS for the construction and operation of the new container park. This request emphasised the urgency of the problem, and the fact that international competitive bidding procedures would take time. On the following day CMC granted the approval sought, citing Part E, Section 11b, 11c and 11d of the IPPPP.

6. Pursuant to this approval, NPA and GSS executed on 23 August 2005 another written Build Operate and Transfer Agreement ("the August Agreement"), granting to GSS for a period of 12.5 calendar

-2-

years the exclusive right and duty to occupy and develop an area of land allocated by the NPA as a container park, to supply necessary equipment, and to operate the park on a profit-sharing basis. In consequence of CMC's approval there was no public tender or competitive bidding, but on 29 August 2005 CMC expressly confirmed that the process employed and its outcome satisfactorily met the requirements of transparency and accountability prescribed by the IPPPP. From this point onwards, if not before, the June Agreement seems simply to have fallen away.

7. Although the August Agreement was on the same general lines as its predecessor there were significant differences. In particular, the provision for dispute resolution contained in Article VIII was not the same as before. It now provided as follows:

"8.1 In the event of its formation, validity, interpretation, performance, termination, enforcement or breach for which an amicable settlement cannot be achieved by and between the parties, they shall result to arbitration. This arbitration shall be governed and interpreted in accordance with the laws of England and Wales. Any disputes which may arise between the parties, out of or in connection with this agreement, its interpretation, performance or breach, shall be referred to a binding arbitration. It is further agreed upon by the parties that each hereto shall name an arbitrator with a third arbitrator being selected by both parties. The panel or arbitrators thereafter shall elect from among themselves a Chairperson. The arbitration shall be held in London England and shall be conducted in the English language...

8.2 The Chairperson shall have sole jurisdiction to choose the

–3–

appropriate procedures and evidence rules to be applied in the arbitration, but will be obligated to provide reason for his verdict."

8. After pressure applied by a group representing foreign interests GSS agreed to amend the August Agreement. On 28 October 2005 the NPA and GSS executed, and there was subsequently notarised, a written Agreement amending that Agreement in respects not presently material.

9. On 30 December 2005 Mr. Gyude Bryant, Chairman of the National Transitional Government of Liberia wrote to the Chairman of the Board of the NPA complaining about the terms of the August Agreement and directing that "a more holistic management contract" should be entered into, and that the sourcing of the management team for the project must be carried out by a competitive bidding process under terms of reference agreed upon and approved by the CMC.

10. Inconclusive correspondence then took place, including a letter from the new Managing Director of NPA repeating the grounds which were said to have justified the cancellation of the August Agreement. GSS challenged these allegations, and after further fruitless exchanges the Managing Director of NPA wrote to the General Manager of GSS on 10 February 2006 directing that the GSS Group should with immediate effect vacate the premises of the Freeport.

11. Six days later the Chairmen of NPA wrote to GSS setting out the former's contentions about the legal position which were (in brief) that — (a) the waiver by CMC of the requirement for a competitive tender was based on a misrepresentation by GSS; (b) the effect of

—4—

the waiver, and of the consequent omission of competitive bidding was that the terms of the Agreement were "clearly inequitable"; (c) in the absence of an "official letter" from JCGL confirming the latter's acceptance of the amended contract GSS should not have finalized the contract and commenced its implementation. The conclusion drawn in this letter was that "the contract is invalid and null and void ib initio", and should be put out to a public tender in accordance with the IPPPP.

12. On 15 March 2006 Messrs. DLA Piper Rudnick Gray Cary wrote to NPA on behalf of GSS refuting the allegations of NPA and claiming that NPA was in repudiation of the August Agreement for which it would be liable in damages if persisted in. The letter concluded by demanding arbitration under Article VII of the August Agreement.

13. This letter received no response, and on 23 June 2006 GSS appointed Me (Michael John Mustill) as its arbitrator, giving notice thereof on the same day, and calling on GSS to appoint its own arbitrator within 14 days.

14. Again there was no response, and on 13 July 2006 Messrs DLA Piper warned that if NPA did not within seven days appoint its own arbitrator they would appoint me as sole arbitrator, pursuant to section 17(2) of the (English) Arbitration Act, 1996 (hereafter, "the 1996 Act"). In due course this is what they did, and I have henceforth acted sole Arbitrator in respect of the dispute.

15. Meanwhile, on 28 August 2006 the Public Procurement and Concession Commission ("PPCC"), a statutory agency of the Government of Liberia established on 21 September 2005, issued a

-5-

Petition in the Civil Law Court of Monserrado County naming NPA and GSS as respondents.

16. This Petition asserted a number of complaints against NPA and GSS. In summary, these were as follows. First, that the conclusion of the two contracts without public tender was to the knowledge of NPA and GSS in breach of the Interim Public Procurement Policy and Procedures law ("IPPPP"), with the result that the arbitration clause in the August Agreement was null and void. Second, that the inclusion of the arbitration clause was contrary to the principles governing the procurement of public works in Liberia, and that the clause is therefore invalid. Third, that the approval granted by CMC for the contract to be exempted from public tender and competitive bidding "...was based on collusion and connivance", the gist of the allegation being that CMC was wilfully misled by GSS into believing that there was an urgent need for compliance with the International Ship and Port Facility Security Code. The absence of competitive bidding led to the conclusion of a contract which gave a grossly unfair pecuniary advantage to GSS at the expense of NPA. Finally, that the contract was procured by improper conduct and fraudulent inducement by GSS in the shape of bribes offered by GSS.

17. Basing on these complaints, PPCC sought three items of declaratory relief:

   (i) The arbitration clauses were illegal and null and void ab initio.
   (ii) The entire August Agreement was invalid because the approval granted by CMC was induced by a misrepresentation as to the urgency of reinstating the project.
   (iii) The August Agreement was illegal because it was procured by improper conduct and fraudulent inducement.

-6-

18. In response to this Petition GSS entered a Special Appearance contending that PPCC had no standing to bring the suit, not being a party to the August Agreement, and also that in the light of the arbitration clause the Court should refuse jurisdiction over the matter.

19. GSS also, on 11 September 2007, filed a Motion for a 30-day enlargement of time within which to respond to pleadings. This document is not amongst those placed before me.

20. On 8 November 2007 the applications by GSS came on for hearing in the Civil Law Court before His Honour Judge Kara. The essence of reasoning set out by the learned Judge in his judgment was that the use of a Special Appearance was appropriate only for questioning the court's jurisdiction over the person, and that it could not be used to raise items of subject matter jurisdiction, which were governed by a different part of the Civil Procedure Code. In the present instance the objection founded on the arbitration clause was just such an item.

21. In the event, however, the Court was willing to grant GSS an opportunity to raise the issue in proper form "...to enable the Court to make a determination as to the merit of the Application". The Court therefore denied the Special Appearance Application and re-listed the application for an extension of time, which had not yet been the subject of an adjudication.

22. The only information before me as to the subsequent history of the Liberian proceedings is the statement in a letter of 30 January 2008 from Mr. James E. Pierre, on behalf of NPA, that Judge Kaba had

-7-

scheduled a hearing on 7 February, 2008, coupled with a warning that if GSS did not file a response a default judgment might be rendered granting PPCC's petition. Whether GSS did respond, and if not whether a default judgment was issued, I do not know.

23. Returning to the position in the arbitration, fruitless attempts were made by GSS and subsequently by myself to persuade NPA to formalise their complaint about my assumption of jurisdiction by serving an answer to the claim, in which could be incorporated any submissions on jurisdiction which NPA wished to advance. This is a well-recognised procedure in cases where an issue on jurisdiction has a factual element. It involves no risk to the respondent, who can effectively reserve his challenge on jurisdiction, and invite the tribunal to deal with jurisdiction as a preliminary issue, and it can be of great help to the tribunal, as it provides a precise and concrete foundation on which to base its ruling.

24. Since NPA did not voluntarily take this course Accordingly, on 28 January 2008 I issued a direction that NPA should deliver its Defence Submissions not later than 14 February 2008, with a warning that if the direction was not complied with I would have no alternative but to adopt the appropriate default procedures. NPA did not comply, and GSS have now called for a default award.

B.  Questions for decision.

25. In order to make a complete award on the questions in dispute, the Arbitrator whose jurisdiction is under challenge may be called on to decide questions which fall into three broad categories: (i) jurisdiction; (ii) liability; (iii) quantum. In discussing those which arise in the present case I will refer to the person nominated to act

as arbitrator (i.e. in this case, myself) as "the Arbitrator", without prejudice to the objections to my appointment or to my competence to decide issues on the scope and validity of his appointment and powers.

26. Two questions, associated but not identical, arise in relation to jurisdiction:

    (I)   Is the Arbitrator competent to decide upon his own jurisdiction in respect of the substantive matters in dispute?

    (II)  Doe the Arbitrator actually possess jurisdiction to decide the substantive issues in the arbitration, given that NPA has raised allegations of misrepresentation, bribery and illegality?

27. By way of preliminary, I must explore the consequences of the failure by NPA to comply with the direction of 28 January, 2008. By virtue of section 41(4)(b) of the Arbitration Act, 1996 the Arbitrator was empowered to "make an award on the evidence before [him]". A ruling on jurisdiction is not an automatic consequence of NPA's default; it is for the Arbitrator to decide whether one should be made, and if so what its terms should be.

28. In the case of Question (I), above, there is no room for doubt. Section 30(1) of the 1996 Act, in alignment with consistent international jurisprudence, and the UNCITRAL Model Law on International Commercial Arbitration (Art. 16(1), stipulates as follows:

    "30(1)  Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as

–9–

> to—
>
> (a) Whether there is a valid arbitration agreement..."

The various allegations of fraud, bribery and illegality relied upon by NPA are all challenges to the validity of the August Agreement and of the arbitration clause embedded in it, and are hence subject to decision by the Arbitrator.

29. This opens-up Question (II) above, which is whether in this particular case the Arbitrator does in fact have competence to adjudicate on the substantive dispute, given the nature of the only defences raised to the claim.

30. The first step is to consider whether the proceedings before the Courts of Liberia have any effect on the English arbitration. In my opinion, intending no disrespect to those Court, they have no such effect.

31. One proposition advanced is that by entering a Special Appearance GSS lost its right to insist on arbitration under Art. VIII. With due respect to Mr. James Pierre's submissions I find this quite impossible to sustain. I am not competent to express any opinion on whether as a matter of Liberian law the right procedure was adopted to enable GSS to put forward its case that the Court should honour the agreement to arbitrate and allow the dispute to go forward for decision in London, but whatever the true procedural position may be it is quite clear by adopting this process GSS not only did not accede to the jurisdiction of the Liberian Court, or waive its right to arbitrate in London, but made it quite explicit that it insisted on the enforcement of that right.

-10-

06/03 2008 16 39 FAX 02078138080          ESSEX COURT CHAMBERS                    ☒013/018

32. Nor is it possible to treat the Liberian Judgment as conclusive on the matters in issue in the London arbitration, since the doctrines which might be prayed in aid here, such as *res judicata* and issue estoppel can have no application here. For this, there are at least two reasons–

   (a) The parties to the two sets of proceedings are not the same. The hearing before Judge Kaba was a contest between PPCC on the one hand, and NPA and GSS on the other. There was no "*lis*" between these two parties. This is an insuperable obstacle in the way of treating anything decided in the Liberian proceedings as binding in an arbitration between GSS and NPA.

   (b) Contrary to the submissions of NPA, the Liberian Court made no ruling on the jurisdictional issues. It did not rule against GSS on any jurisdictional issue, or on the validity of the arbitration. All that it decided was that GSS had taken the wrong procedural route. The Court did not address the merits, as the passage quoted in paragraph 21, above clearly shows.

33. This leaves the question whether, even if in general terms an Arbitrator has power to rule on his own jurisdiction, there are certain types of *substantive* issue which he cannot as a matter of logic pronounce upon without imperilling the basis of his own jurisdiction. An illustration will make this problem easier to address. Imagine claims are brought in an arbitration alleging a breach of the contract of which an arbitration clause physically forms part. Imagine also that amongst the defences to the claim are allegations of

-11-

06/03 2008 16:39 FAX 02078138080           ESSEX COURT CHAMBERS                    ☒014/018

misrepresentation, bribery and illegality, all relied upon to destroy, in one way or another, the validity of the contract. At first sight issues so arising might seem to lie outside the jurisdiction of the arbitrator; for if (say) the arbitrator were to hold that the defendant could make good a defence of misrepresentation, rendering the contract voidable, the act of avoidance would destroy the contract of which the arbitration clause formed part. So, by deciding in favour of the defence arbitrator would cut away from under his own feet the source of the jurisdiction on which his decision depended. A similar line of reasoning could be applied to situations where the defence involves the proposition that the substantive contract is void ab initio.

34. Attractive as this logic might seem at first sight the premise, that if the substantive contact falls away the embedded arbitration clause falls with it, ceased to be the law in England more than seventy years ago. On the contrary it is now firmly established in England, and in many jurisdictions world-wide, that (in the words of the UNCITRAL Model Law, (Art. 16(1)), "an arbitration clause which forms part of a contract shall be treated as an agreement independent of the other terms of the contract". The corollary, for the purposes of English law, is that —

> "...an arbitration agreement which forms or was intended to form part of another agreement...shall not be regarded as invalid, non-existent or ineffective because that other agreement is invalid, or did not come into existence or has become ineffective, and it shall for that purpose be treated as a distinct agreement". (Section 7, Arbitration Act 1996).

35. It follows, therefore, that in the present case the Arbitrator is

entitled to take cognizance of and rule upon NPA's assertion that the August Agreement was induced by misrepresentation, notwithstanding that if this case succeeds on the facts the August Agreement will be declared voidable and may be set aside. Article VIII is regarded by the law as being for this purpose separate from the substantive provisions of the August Agreement; it does not stand or fall with them but has a sufficiently independent life of its own to survive whatever has happened to that Agreement. Only if it were alleged that the arbitration clause had never been agreed at all between NPA and GSS would the argument against jurisdiction have substance, and no such contention is advanced. This independent life is sufficient to enable the Arbitrator to rule on the substantive defences to the claim without imperilling his own jurisdiction.

**Ruling.**

For these reasons it is my opinion that irrespective of the potential effect on the August Agreement of the matters of complaint raised by NPA I have jurisdiction,

    (a) to consider and rule upon all the claims and defences in issue between the parties; and,

    (b) in particular, to consider and rule upon the allegations of bribery, misrepresentation, and illegality raised by NPA in answer to the claim.

-13-

06/03 2008 16 39 FAX  02078138080      ESSEX COURT CHAMBERS                    016/018

*[signature]*

(Lord Mustill)
(Sole Arbitrator)

LONDON                                              3 March 2008

-14-