In the Matter of an Arbitration

Between

GLOBAL SECURITY SEALS GROUP

Claimant

-and-

NATIONAL PORT AUTHORITY

Respondent

FIRST PARTIAL AWARD (LIABILITY)

(26 JUNE 2008)

WHEREAS:

A. The above-named parties are in dispute concerning the validity and termination of an Agreement between them dated 22 August 2005 ("the Agreement").

B. The dispute has been referred to arbitration before me, Michael John (Lord) Mustill.

C. Upon a challenge by the Respondent I determined in a written Ruling on Jurisdiction dated 3 March 2008 that I have jurisdiction as arbitrator in respect of the said dispute.

D. In the exercise of this jurisdiction I issued a peremptory procedural order pursuant to section 41(5) of the Arbitration Act, 1996 of England and Wales in the following terms:

"The Respondent National Port Authority shall, not later than 18.00 hrs UTC, serve on GSS and on DLA Piper and on myself as Sole Arbitrator a statement of its grounds of defence to the claim by GSS together with a statement of the evidence adduced in support of its defence".

E. The Respondent did not comply with this Order, and I consequently became invested with the default powers conferred by section 41(7) of the Arbitration Act, 1996 ("the Act").

-1-


EXHIBIT 7

NOW I <u>Michael John (Lord) Mustill</u> in the exercise of my powers under section 47(1) (c) of the Act do hereby make and publish this my First Partial Award as follows

### *First Partial Award (Liability)*

1. I hereby **award and declare** that the Respondent is liable to the Claimant for breach of the Agreement.

2. I hereby **award and declare** that the Respondent is liable for damages to be assessed in relation to the said breach.

### *REASONS*

### *FOR THE FIRST PARTIAL AWARD*

1. The Act) confers on an arbitrator four distinct powers in the event that a peremptory order is not complied with. Of these, I believe that the most apposite to the present case is the one created by section 41(7)(c), which enables him to—

   "...proceed to an award on the basis of such materials as have been provided to [him]."

2. Since there is no doubt that the Respondent ordered the Claimant to cease work and vacate the site the only issue on liability in the present case is whether there were grounds which entitled it to take that step. If there were not, the Respondent was in repudiatory breach of contact. Since the Respondent has not come forward to present its case on liability, despite being given ample opportunity to do so, I am left with no alternative but to examine such documents as have been laid before me, to see whether there is any potential defence to which I should give effect even in the absence of the Respondent.

3. I find that the following grounds for dismissing the Claimant were advanced at the time. First, that the Agreement was inequitable, being unfairly balanced in favour of the Claimant. I am unable to see how this could be a ground for termination. Even if the position had been

-2-

as stated, the position would simply be that the relevant agencies of the State had enabled it to make a bad bargain. No argument has been developed to explain how this could excuse the Respondent from being obliged to perform it.

4. More serious is the allegation that the Agreement was procured by corruption. If proved, this would be a defence to the claim. The Respondent has not come forward in the arbitration to present its defence, but in view of the very special nature of the allegation I am under an obligation to deal with the point as best I can on the materials before me.

5. In relation to a claim of this kind the burden of proving the allegation of corruption is on the party who alleges it: in this case, the Respondent. There is currently a controversy in the authorities, about the standard of proof to be applied: whether the criminal standard of proof is applicable, so that the party making the allegation must make the arbitrator sure beyond reasonable doubt that it is true, or whether the civil standard, which calls for a decision on balance of probabilities, should be applied, or whether there is an intermediate, and variable standard, somewhere between the two. I need not enter into the law, national and international, on this question for it is in my view plain that whatever standard is called for, it is not satisfied here.

6. Three affidavits have been produced. The first two were made respectively by Mr. Joe Gballah, the former Managing Director of the National Port Authority ("NPA"), and by Ms. Christina Blamo, a former member of its Board of Directors. Mr. Gballah described a meeting with Mr. Ehud Melnik, the project manager for the Claimant, who asked him to arrange for a contract to be awarded by NPA without public bidding under the supervision of he Contracts and Monopolies Commission ("CMC"). Mr. GbAllah was successful in this, so that a Build Operate and Transfer contract was signed without public bidding. Only one month later, however, the contract was cancelled by Mr. Bryant, the Chairman of the Previsional Government, insisting on compliance with the procurement law. Mr. Melnik soon returned to the matter, on this occasion accompanying his request that Mr. Gballah should intervene by a payment in cash. Again Mr. Gballah complied, and the outcome was the contract of 22 August 2005, on which the present claim is founded. Ms Blamo gives a briefer account of an approach by Mr. Melnik, who promised payment for a vote in favour of the contract when it came before the Board for approval. US$ 10,000 was paid to Ms. Blamo in advance, and a further US$ 15,000 was promised for payment after she had voted to approve the contract.

7. The only other evidence on this matter was the third affidavit, sworn

-3-

28-JUN-2008 11:26   FROM:MUSTILL            402074826176        TO:76920326           P.5/9

by Mr. Melnik on behalf of the Claimants. In a very few lines the deponent denies the statements in the two affidavits, and goes on to say that he later spoke to Mr. Gballah who denied signing his affidavit or receiving any payment from Mr. Melnik.

8. This is a familiar enough story, in the context of modern contract procurement, and may be true, for all that I can tell. The point is, however, whether it is proved to be true. In my opinion it is not. It would be quite impossible to find this dishonest conduct established on material as thin as this, particularly as the Respondent's refusal to participate has deprived the tribunal of the opportunity to weigh up the credibility of the deponents, and to see and hear them subjected to cross-examination. Whatever the appropriate standard of proof the Respondent has by a long distance failed to satisfy it.

9. I therefore reject the only potential ground of defence of which I have to take account, and the Claimant's claim must succeed, as I declare in the Partial Award. The relief to be granted is another matter, to which I come in a Procedural Order, contemporaneous with this Partial Award.

*MJMustill*

M J Mustill
(Sole Arbitrator)

London

26 June 2008

28-JUN-2008 11:27 FROM:MUSTILL 402074826176 TO:76920326 P.6/8

In the Matter of an Arbitration

Between

## GLOBAL SECURITY SEALS GROUP

Claimant

-and-

## NATIONAL PORT AUTHORITY

Respondent

### Procedural Order

(26 June 2008)

1. In my First Partial Award herein I have declared the Respondent to be liable for damages to be assessed in respect of a breach of the Agreement of 22 August 2005.

2. It now falls to me to assess the damages, "on the basis of such materials as have been properly provided" (section 41(7)(c) of the Arbitration Act, 1996). The circumstances are most unusual, for the sum claimed is very large, even by modern standards, and yet the Claimant has provided little in the way of materials to support it, leaving me to give serious consideration to whether on a demand for more than $US 70,000,000 the Claimant should recover nothing, simply for want of proof.

3. So far as I understand it, the claim is for a sum arrived at by adopting the estimates made by a consulting firm (BDO Ziv Haft) of the profits which would have accrued to the Claimant under the Agreement, if it had been allowed to remain in existence, during each of the years between 2005 and 2018, and then simply adding them up to arrive at the massive claim. Whilst it is not my function to make for the Respondent a case which it has not come forward to make for itself, I would be doing much less than justice if I did no more than take the claim figures at their face value, and award accordingly. I say this for the following main reasons:

    (A) Although BDO's Report looks like a third-party evaluation, this is not in reality what it is, for in the body of the Report we find the

-1-

following—"We relied on data presented to us by GSS in preparing this study. We did not examine the correctness or completeness of the information. The information and data from the aforementioned sources were assumed to be correct, and reliance on them does not constitute verification or confirmation of this data". The information supplied by the claimant to BDO may have been right, but it has at present no objective evidentiary value.

(B) The earnings projections contained in the Report assume, as the Report itself points out, that the Claimant would operate the park for the whole concession term. Given the volatility of political and economic life in Liberia, this assumption seems unrealistic. Some discount should surely be made for the possibility of premature termination.

(C) To accumulate projected earnings as far ahead as 2018 and simply award them today without any allowance for the acceleration in cash flow which this would involve is quite unlike any computation of damages which I have ever seen. An exercise in the nature of Discounted Cash Flow is I believe invariable in present-day dispute resolution, where a valuation is based on future revenues. To apply this to the present claim would greatly reduce the recovery, although by how much I have at present no means of saying.

4. These objections are not fatal to the recovery of any sum at all, and I have not overlooked the fact that the Chairman of the Provisional Government himself complained that the Agreement was unfairly favourable to the Claimant. But an attempt on my part to put a figure at the present stage to the Claimant's loss through the cancellation of the Agreement would be no more then guesswork, and the sum involved is so large is so large that this would not be an acceptable process.

5. In these circumstances I invite the Claimant to reconsider the quantification of its claim, and to provide me with a realistic way of evolving a figure, using data and methods which I have means of testing.

Further than this I cannot go. It is for the Claimant to select a plausible basis for claim, and to furnish materials to back it up. I appreciate that this will take time and money, but if the Claimant is serious about the figure which it advances the cost and labour will be well spent.

I therefore require the Claimant to place before me, naturally with a copy to the Respondent, a statement of how it wishes me to approach the task of quantification. When this has been clarified and subjected to scrutiny,

-2-

appropriate further steps can be considered. If the Claimant considers that an oral hearing will be of value, please inform me and I will make the necessary arrangements, of which I will notify the Respondent.

Accordingly I now **DIRECT** that the Claimant shall not later than 25 July 2008 submit to me, with copy to the Respondent, a Memorial setting out the nature of its case on the evaluation of damages.

*M.J. Mustill*

M J Mustill

(Sole Arbitrator)

London

26 June 2008.