In the Matter of an Arbitration

Between

GLOBAL SECURITY SEALS GROUP

Claimant

-and-

NATIONAL PORT AUTHORITY

Respondent

SECOND PARTIAL AWARD (QUANTUM)

(7 May 2009)

WHEREAS:

A. By a Partial Award in this Arbitration dated 26 June 2008 I awarded and declared that the Respondent is liable to the Claimant for breach of the Agreement between the parties dated 22 August 2005 and left over for further consideration and award the amount of such liability.

B. I subsequently received from the Claimant written evidence and submissions on the amount of liability. The Respondent adduced no evidence or submissions on that question, notwithstanding being given an opportunity to do so.

C. Having carefully considered the materials laid before me on the amount of the Respondent's liability I hereby make and publish this my Second Partial Award as follows:

### Second Partial Award (Quantum)

1. The Respondent shall pay to the Claimant the sum of



EXHIBIT 8

## USD 44,347, 260.00

(Forty four million, three hundred and forty seven thousand, two hundred and sixty United States Dollars).

2. The question whether the Respondent is liable for additional sums in respect of (a) Interest, and (b) costs, and if so in what amounts, will stand over for further decision.

*MJ Mustill*

(Lord Mustill)

London

07 May 2009

REASONS

For the Second Partial Award of Lord Mustill dated 7 May 2009

1. Since this is a claim for damages, and not for a debt or other fixed sum, the Claimant is required to establish its claim in three stages, for each of which the civil burden of proof must be satisfied; that is the Claimant must demonstrate that in the light of the evidence laid before the Tribunal it is more likely than not that the requirements of each stage have been established. These stages are: (i) This being a claim for breach of contract, that the Respondent committed the breach alleged; (ii) That there was a causal connection between the breach and the detriment to the Claimant in respect of which the claim is brought; (iii) That the detriment caused financial damage to the Claimant in the amount claimed or, if that is not proved, in some lesser amount.

2. I state these elementary principles here because it must be understood that they apply as much to a case where the Respondent abstains from participating as when the case is fully fought on both sides. What must be proved is just the same, as is the burden of proving it on "balance of probabilities". The fact that the Respondent has made no effort to rebut the claim does not absolve the Claimant from the need to prove it. Nothing is assumed in favour of the Claimant.

3. In the present case the first two of the three stages have concluded with the First Partial Award on Liability dated 26 June 2007. The Claimant has proved that the Respondent committed a breach of contract, and that the consequence was a detriment to the Claimant in the shape of the loss of the contractual right to earn revenue by performing services under the Contract. There remains the third stage, which requires an evaluation in monetary terms of the lost

revenue.

4. In principle this is familiar territory, and although the first two stages encountered some procedural difficulties there was nothing particularly out of the ordinary about them. Nor in my opinion is there any problem about the method of evaluation to be adopted here, for although recent decisions of the English courts have introduced some refinements in the evaluation of losses resulting from the repudiation of long-terms contracts the Respondent has not come forward to contend that they are relevant here, and I do not myself believe that they are. I prefer to adopt the more customary method described below.

5. First, however, it must be stressed that this is a most unusual case, not so much because of the size of the claim, which although very large is not on a par with some of those which are advanced in international arbitration today; nor because the Respondent chose not to avail itself of the opportunity to present an answer to the claim which might have had some success, and which could have been put before the Tribunal without fatally prejudicing the possibility of reviving at a later stage the challenge to jurisdiction; nor again because neither party sought to call even a single witness to give oral evidence, or to invite the Tribunal to summon a potential witness for the other side for the purpose of cross-examination. Rather it was a combination of all three features which has given the present arbitration its unique character.

6. Add this, that the subject-matter of the dispute has been the right to handle cargo in a port which, at the time the dispute arose, was (to put it charitably) in very poor shape and would require a substantial period of refurbishment before it even started to earn money. Add further that the context of the movement of goods through the port

would be a country only just beginning to recover from a cruel, long-running and destructive civil war; one of the poorest in the world, internally crippled by corruption and dereliction, with a per capita income of less than USD800 and externally with unsustainable international debts approaching USD 4 billion.

7. In these circumstances it was inevitable that a claim for the present payment of a sum amounting to a really significant fraction of the country's entire income on account of the loss of handling rights at Monrovia should be looked- at with a sceptical eye, a viewpoint reinforced by the Claimant's methodology of claim. This simply made projections for the net earnings (in this volatile context) over the next 15 years, and added them up. This could not be right. An award would provide the Claimant with a capital sum which could immediately be put to use, whereas the Contract would yield returns only over a long period of time, during which the Claimant would have to wait for the opportunity to employ the moneys as and when they fell due. If the Claimants wanted an immediate Award they would have to allow for the advancement of payment which it would involve. This fact of economic life is reflected in the almost universal practice of valuing this type of claim by means of a discounted cash flow ("DCF") calculation.

8. By omitting any reference to this obvious factor the Claimant put forward a claim which was transparently wrong. An investor who ignored it when acquiring an asset would not be in business for long, and there was cause to wonder why the present Claimant wasted time, and took the risk that the Tribunal would question its good faith, by pressing for a sum which could not possibly be due. It also took the risk that if the Tribunal rejected its excessive claim there would be nothing else on the table, supported by evidence or argument, to which the Tribunal could have recourse as an

alternative, the result being that the claim would entirely fail for want of proof.

9. The first of these risks was too speculative to be seriously entertained. It is true that the use of arbitration as cover for unlawful activity (e.g. money laundering) is not unknown, but there was nothing in the contemporary documents to suggest collusion, and no ground for suspecting that some other form of illicit conduct was afoot. The expenditures were fully vouched in a way which it would be fanciful to regard as fabricated. Money had genuinely been spent on the aborted project, and wasted even if, in the event, the claim to recover it did not need to be pursued; see below. The claim itself, which was advanced through the medium of reputable solicitors, was not fictitious, and indeed succeeded so far as the establishment of liability was concerned; and its extravagant size was unlikely to have been the outcome of a deliberate policy of deception, since its unsoundness was too transparent to form part of a plan to deceive either the Tribunal or the fiscal or other authorities. It is a curious feature of the history, but not one which should be fatal to the claim.

10. By contrast, the second of these risks did give the Tribunal real concern. If the only existing claim was negative, leaving a void, it could well be said that it was no part of the Tribunal's duty, or even right, to step forward and fill it with an initiative of its own, making a case for the Claimant which it had not troubled to make for itself. The bare logic of this objection is hard to fault, but it applies too narrow a focus; the Tribunal has found a breach, and has found a causal connection to the loss of the revenue stream. Since that future revenue undoubtedly had a present value, which the Tribunal was obliged to ascertain, it would be leaving its task half-done if it pulled back from substituting its own evaluation, and to make such an evaluation would not in my opinion be inconsistent with the

essentially adversarial nature of the process.

11. Equally, the Tribunal can and should take account of two potential objections which, although not expressed by the absent Respondent, are so obviously part of the entire picture that they cannot sensibly be overlooked. The first is that there is something distasteful and disproportionate about awarding tens of millions of US Dollars against a state agency when the state and its nationals are in the depths of poverty — the more so where the Respondent's breach was concerned with a trailer and cargo storage facility, rather than with some more dynamic and crucial element in the economic life of Liberia. Whilst there is force in this comment, it cannot be conclusive against the claim. If the Respondent made a contract and broke it, the breach should be paid for even if the burden is too great for the decayed economy of the state to sustain. That was the outcome of the Respondent's decisions to make the contract, and then break it. Perhaps the decisions were unsound, but if so that was the fault of the Respondent, not the Claimant, which cannot logically be made to suffer for it.

12. The second objection is to the method of evaluation, which (it might be said) uncritically plods through a conventional procedure without any consideration of the possibility that such although such a procedure is in general a sound way of capitalising future income it is inappropriate to the extreme case of the Liberian infrastructure. Internally, the financial situation was disastrous, and internationally the country was sinking under the burden of an insupportable weight of debt. The generalisations appropriate to an ordinary discounted cash-flow computation cannot be uncritically applied in such a situation.

13. Here again, there is force in the objection, but not enough to require

the DCF method to be entirely abjured. It is not, after all, as if the future earnings were directly dependent on the efficiency and honesty of the state itself and its officials, for the future incomes were derived from the importers and exporters, for whose charges the goods stood as security. It was true of course that the country's economic decay was reflected in the volumes of import and export, and that since the port of Monrovia was the only viable gateway to the world of foreign commerce it operated under the shadow of the adverse trading conditions. But this did not mean that there would be no earnings at all, or that a cash-flow projection would be meaningless, only that the computation of its present value might have to be heavily discounted for adverse contingencies.

14. Accordingly, the Tribunal thought it fair to give the parties one more opportunity to present a more thoughtful and informative submission on the calculation of loss. Consistently with its previous stance the Respondent took no part, thus depriving the Tribunal of assistance which would have been very welcome; but the Claimant did take the opportunity to produce a fresh body of evidence. The Claimant did not completely re-formulate its case, and in particular rightly abstained from trying to argue for the loss of a chance. Instead a much expanded body of evidence was adduced to support two alternative bases of claim. First, for the capitalised value of the anticipated cash flow, and second for the expenditures wasted by the cancellation of the contract. The latter was very much a fall-back position, kept available in case the claim for future earnings entirely failed. Since, as will be seen, the Claimant does in the event recover in respect of lost earnings, there is no need to explore the details of the claim for wasted expenditures.

15. Concentrating, therefore, on the capitalised loss of earnings, the method employed was that of discounted cash flow, with

adjustments to the discount rate to allow for various contingencies. Three stages were involved: (1) Make a retrospective forecast of the future net earnings of which the breach deprived the Claimant. (2) Select and apply to the total earnings during the period of the forecast a rate or rates of discount to reflect the fact that the Claimant will be getting all of its money in at once, rather than at intervals over a long period of time. (3) Adjust the rate or rates if necessary to reflect any special circumstances likely to affect the earning power of the contract.

16. Whatever the position might have been if the Respondent had chosen to challenge the expert evidence of future net earnings, the first stage of this process raises few problems for the Claimant. Scrutiny of this evidence discloses no such inherent improbabilities or internal inconsistencies as would justify the Tribunal in rejecting it outright, nor are there materials from which the Tribunal could deduce opinions of its own. The forecast may or may not be sound, but once it is accepted that the claim is honest and has a solid intellectual foundation, in the absence of any attempt to rebut it the Tribunal cannot properly do anything other than find it proved.

17. The second stage is less straightforward, since notwithstanding appearances the choice of rate is essentially subjective, once the primary facts have been ascertained. The present case is a good example, in two respects. One is the reliance by Mr. Bartov Shlomi in his expert report of 26 November 2008 on data from the published US Department of Treasury. At first sight it seems odd to capitalise the earnings of a service enterprise in one of the poorest countries in the world, by reference to the yields of government debentures issued by the richest country in the world. On reflection, however, it can be seen that this is not so strange. To adopt a word used in the documents, the economy of Liberia is highly "dollarised", and there is

no local source of financial information which would better serve the purpose. A risk-free rate of 4.45 percent is in my opinion a proper figure from which to start the calculation.

18. The other problem, at this initial stage, comes from the fact that the rates were selected before the catastrophic upheaval, in recent months, of the world-wide financial markets. The papers before me offer no clues as to how this should be dealt with and it might seem that some kind of guidance would be of value. In the end, however, I did not find this a handicap, because of the opinion which I hold about the use of hindsight in the retrospective valuation of lost future earnings. The present case furnishes an excellent example of why it is both intellectually unsound and practically unworkable to rewrite the data as and when changes occur, up to the moment when the calendar of the fact-finding tribunal allows time for the evaluation to be performed. It is in my opinion much sounder to fix on the date of the wrongful repudiation and perform all computations as at that date, and this is what I aim to do.

19. This is however only a beginning, for the Claimant and its expert accept that various factors call for an adjustment in the rate of discount. The first is a "market risk premium". This is one of a number of areas in which I would have welcomed the opportunity, denied by the absence of the Respondent, to hear the expert answer questions in an adversarial context, for I am not at all sure that I comprehend the reason why the latter calls up the features of the US equity market as an exemplar of the likely performance of the earnings of a trailer park in the port of Monrovia. Once again, however there is no other information on which I can found, and since this particular premium (4.8 per cent) operates in the Respondent's favour, I can see no justification for rejecting it. Next, the expert went on to add 2 per cent to reflect "the additional risks of

the project that usually don't get to be expressed properly through the product of beta and market premium". No explanation is given for the figure, as distinct from the principle, very likely because it was a matter of judgment, not calculation. At all events, the principle cannot be attacked as plainly wrong, and neither can the figure. A qualified expert has advanced the latter, and the Claimant has not challenged it in spite of its adverse effect. This yields a discount rate of 10.45 per cent.

20. Finally, Mr. Shahar Ziv adds a further 3 per cent that in his opinion "might be a conservative estimation of " political risks "not entirely expressed" in his calculation thus far, yielding a total rate of 21.95 per cent. In its "Memorandum on Damages" the Claimant gives reasons why this last modification is unsound. After careful study I have concluded that in the light of the special difficulties faced by any enterprise carried on in the current circumstances of Liberia some such further adjustment is called for, and I have no materials on which to prefer some other figure. I must add that I am not convinced that it would be legitimate for the Claimant, having adduced Mr. Shahar Ziv's Report as part of its evidence to go on to maintain that part of it is incorrect.

21. Accordingly, I give effect to Mr. Shahar Ziv's Report in its entirety. This yields a capital sum of USD **44,347,260**. (See paragraph 3.5.4 of the Report), the figure contained in my Partial Award.

22. There remain the questions of interest and costs. I have no doubt that the Claimant is entitled to a recovery under both headings, but further assistance will be required as to principles and amounts before I can make a Final Award in respect of this, to bring the Arbitration to an end. I shall be in touch with the parties about this as soon as possible.

*M J Mustill*
(Lord Mustill)

London
7 May 2009