UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____ )
GSS GROUP LTD. (a/k/a GLOBAL SECURITY      )
SEALS GROUP, LTD.),                         )
                                            )
            Petitioner,                     )
                                            )
      v.                                    )      Civil Action No. 12-0332 (PLF)
                                            )
REPUBLIC OF LIBERIA et al.,                 )
                                            )
            Respondents.                    )
_____ )


OPINION

   This matter is before the Court on the respondents' motion to dismiss petitioner's

Amended Petition for an Order Confirming Foreign Arbitral Award. Petitioner GSS Group Ltd.

("GSS") seeks confirmation of an award of approximately $44 million issued against respondent

National Port Authority of Liberia ("NPA"), arising from GSS's claim that the NPA breached a

contract under which GSS was to build and operate a container park at the Freeport of Monrovia,

in Liberia's capital city. GSS's first attempt to confirm its arbitral award — in a separate action

brought before this Court in 2009 — was dismissed for lack of personal jurisdiction over the

NPA, and the D.C. Circuit affirmed that dismissal.

   GSS has now returned to this Court seeking confirmation of the same award, but

this time it has added the Republic of Liberia ("Liberia") as an additional party against which

confirmation is sought, on the theory that the NPA acted as Liberia's agent. Liberia and the

NPA move to dismiss GSS's amended petition on a number of grounds, including lack of

personal jurisdiction over the NPA, lack of subject matter jurisdiction over the action against

Liberia, improper venue, as well as a number of merits-based grounds.  Based on careful consideration of respondents' motion, petitioner's opposition, respondents' reply, the relevant legal authorities, and portions of the record in this case, the Court will grant respondents' motion to dismiss for two reasons: there is no personal jurisdiction over the NPA, and the Court lacks subject matter jurisdiction over the action against Liberia.[1]

## I.  BACKGROUND

The facts of this case have already been set forth in three judicial opinions: this Court's decision dismissing GSS's original action seeking confirmation of the award against the NPA, GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d 134 (D.D.C. 2011); this Court's subsequent denial of GSS's motion to alter or amend that judgment, GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, Opinion (D.D.C. Aug. 10, 2011); and the court of appeals' affirmance of those decisions, GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d 805 (D.C. Cir. 2012).  Accordingly, this Opinion shall set forth only those facts necessary to establish the essential background.

The NPA "is a public corporation, organized under the laws of Liberia, responsible for the management, operation, and maintenance of Liberia's port facilities."  GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 808.  Though wholly state-owned, the NPA "operates at some remove from the government itself."  Id.  Its organic statute, the National Port Authority Act, establishes that the NPA is a distinct juridical entity with the capacity to enter into contracts and to sue and be sued in its own name.  See Public Authorities Law, Ch. VI, § 54(2) (Liberia).

---

[1] The papers reviewed in connection with the pending motion include: GSS's Amended Petition ("Am. Pet.") [Dkt. No. 6]; respondents' motion to dismiss ("MTD") [Dkt. No. 14]; GSS's opposition ("Opp.") [Dkt. No. 19] and exhibits thereto; respondents' reply ("Reply") [Dkt. No. 22]; GSS's Statement of Claim to Lord Mustill ("Stmt. of Claim") [Dkt. No. 19-3]; and Lord Mustill's Ruling on Jurisdiction ("Ruling on Jurisdiction") [Dkt. No. 6-5].

In June of 2005, GSS and the NPA entered into an agreement under which GSS was "to construct and operate a new container park at the Freeport of Monrovia." Am. Pet. ¶ 8. But the following month, a Liberian government agency — the Contract and Monopolies Commission ("CMC") — advised the NPA that its contract with GSS was invalid because it had not resulted from a competitive bidding process, as required under Liberia's Interim Public Procurement Policy and Procedures. Id. ¶ 9; Opp., Ex. 10, at 150 [Dkt. No. 19-6]. Rather than put the contract out for a competitive bid, however, the NPA petitioned the CMC to grant an exemption allowing GSS to be awarded the contract directly, pursuant to a "single-source procurement" arrangement. Opp., Ex. 10, at 154-59. The NPA argued that there was an urgent need to rehabilitate the Port, and that GSS would help further Liberia's compliance with the International Ship and Port Facility Security ("ISPS") Code. Id. The CMC accepted these arguments and granted the exemption. Id. at 160, 176; see also Stmt. of Claim ¶¶ 27-29. GSS and the NPA subsequently signed an amended agreement in August 2005. Am. Pet. ¶ 9; Stmt. of Claim ¶¶ 28-29.

Shortly thereafter, the amended contract between GSS and the NPA came under scrutiny from the International Contact Group of Liberia ("ICGL"). Am. Pet. ¶¶ 30-31. The ICGL was an entity tasked with helping to monitor and enforce the 2003 peace agreement that ended Liberia's civil war, and the United States was among its members. See MTD at 2. In October 2005, the ICGL wrote to the National Transitional Government of Liberia ("NTGL") — which was governing the country until post-war elections could take place — and outlined a number of reasons why the contract between GSS and the NPA caused it "deep concerns." Opp., Ex. 10, at 206-14 [Dkt. No. 19-7]. Specifically, the ICGL noted its reservations regarding the CMC's approval of the exemption permitting the direct award of the contract to GSS, opining

that the requirements under Liberia's Interim Public Procurement Policy and Procedures governing single-source procurement arrangements had not been satisfied.  Id. at 208-09.  The ICGL also cautioned that the agreement represented poor value for money, and that the contract itself suffered from certain technical deficiencies.  See id. 209-14.  In light of this scrutiny, GSS and the NPA signed an amendment to the contract in an effort to address the ICGL's concerns.  See Am. Pet. ¶ 10; Stmt. of Claim ¶¶ 38-39.

Just one month later, however, the Chairman of the NTGL, C. Gyude Bryant, wrote to the Chairperson of the NPA's board, "directing that the GSS contract be cancelled."  Opp., Ex. 10, at 263-65 [Dkt. No. 19-8].  Chairman Bryant explained that the government's analysis showed that "the contract as negotiated and concluded places the Port Authority in a grossly disadvantageous position for more than a decade," and that "the contract does not contribute in any material way to compliance with the ISPS regulations."  Id.  The Chairman directed that any subsequent contract result from a competitive bidding process, and that "proper terms of reference [be] agreed upon and approved by the [CMC] and the technical committee of the [Economic Governance Steering Committee]" of the Governance and Economic Management Assistance Program, an entity established jointly by the ICGL and the NTGL.  Id.; see MTD at 2.  Subsequently, on January 26, 2006 — following the inauguration of Liberia's post-war elected government, headed by President Ellen Johnson-Sirleaf — the NPA notified GSS by letter that it was cancelling the contract, citing the reasons stated by the NTGL's Chairman in his letter directing cancellation.  Opp., Ex. 10, at 273.  In a second letter written by the NPA to GSS on February 18, 2006, the NPA's board Chairperson explained that it appeared upon review that the single-source exemption granted by the CMC had been obtained through

"misrepresentation," and therefore the contract was "invalid and null and void ab initio." Id. at 285-87 [Dkt. Nos. 19-8 to 19-9].

GSS initiated arbitration proceedings pursuant to Article VIII of its agreement with the NPA, which provided that disputes arising from it would be arbitrated in London in accordance with the laws of England and Wales. Am. Pet. ¶¶ 11-12. Because the NPA refused to participate, a sole arbitrator was appointed. Id. ¶¶ 12-13. Meanwhile, the Liberian Public Procurement and Concession Commission initiated an action in the Liberian courts seeking a declaration that the GSS contract, as well as its arbitration clause, were invalid. Stmt. of Claim ¶¶ 73-77. In March 2008, the arbitrator, Lord Mustill, determined that he had jurisdiction over the matter notwithstanding the parallel Liberian court action. See Am. Pet. ¶ 14; Ruling on Jurisdiction. Lord Mustill then proceeded to issue an award in GSS's favor on the issue of liability, followed by a damages award in the amount of $44,347,260. Am. Pet. ¶¶ 15-16.

In July of 2009, GSS filed its first petition in this Court seeking confirmation of the arbitral award. The NPA moved to dismiss the petition, arguing, among other defenses, that the Court could not exercise personal jurisdiction over it consistent with due process, given the NPA's lack of "minimum contacts" with the United States. In response, GSS argued that the NPA, as a wholly state-owned enterprise, could not claim the status of "personhood" within the meaning of the due process clause. This Court held, however, that although foreign sovereigns lack such personhood, the NPA "functions more like a private corporation than a foreign government for the purposes of a Fifth Amendment analysis," and it "therefore may not be haled into an American court without having a sufficient quantum of minimum contacts with the United States." GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 141. "Because [GSS] ha[d] not demonstrated, or even attempted to demonstrate, that the [NPA] has *any* contacts with

the United States," the Court concluded that it lacked jurisdiction over the person of the NPA, and, accordingly, GSS's petition was dismissed. Id.

Following the Court's dismissal of the petition, GSS moved to alter or amend the judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. Its motion raised two arguments that GSS had not advanced in opposition to the NPA's motion to dismiss: (1) that petitions for confirmation of foreign arbitral awards are mere "summary proceedings" and therefore do not infringe on a respondent's due process rights; and (2) that the NPA had acted as an agent of the Liberian government and, therefore, because foreign sovereigns lack due process rights, the NPA was similarly entitled to none. GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 9-10. GSS also sought jurisdictional discovery to develop the factual record regarding the NPA's relationship to the Liberian government. Id. at 9. But this Court concluded that GSS's failure to raise these arguments or to seek jurisdictional discovery earlier in the action meant that these efforts had been waived. Id. at 9-14. GSS appealed, and the D.C. Circuit affirmed the dismissal of the petition. GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 813, 816-17.

The case presently before the Court, GSS contends, "is different from the prior action because it is brought (a) against Liberia as the principal of the NPA of Liberia, and (b) against the NPA of Liberia as the agent of Liberia." Opp. at 1. According to GSS, the significance of these differences is twofold. "First, Liberia will be bound by Lord Mustill's award even though not a signatory to the Contract containing the arbitration agreement. Second, the NPA of Liberia, like Liberia itself, will be subject to this Court's jurisdiction because it will not have a constitutional due process defense to GSS's petition." Id. at 11.

Liberia and the NPA move to dismiss the petition on a number of grounds. Among these are jurisdictional grounds — including arguments that the Court lacks personal jurisdiction over the NPA and subject matter jurisdiction over the action against the Republic of Liberia, due to Liberia's sovereign immunity.  MTD at 18-27, 33-47.  In addition, the respondents argue that venue is improper in this forum.  Id. at 47-48.  The respondents also raise a number of merits-based grounds for dismissal, including that: Liberia was not a party to the arbitration agreement or arbitral proceedings; the NPA lacked the capacity to enter into the contract with GSS; the contract is invalid under the laws of England and Wales; the petitioner, GSS, was in fact not a party to the contract; and enforcement of the arbitral award would contravene the public policy of the United States.  Id. at 27-33, 48-62.  Because the Court concludes that the respondents' jurisdictional arguments are dispositive, it will address only those grounds for dismissal.

## II.  DISCUSSION

### A.  The Foreign Sovereign Immunities Act

The Foreign Sovereign Immunities Act ("FSIA") "is 'the sole basis for obtaining jurisdiction over a foreign state in our courts.'"  Nemariam v. Fed. Dem. Rep. of Ethiopia, 491 F.3d 470, 474 (D.C. Cir. 2007) (quoting Argentine Rep. v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989)).  "A foreign state enjoys sovereign immunity under the Act 'unless an international agreement or one of several exceptions in the statute provides otherwise,'" and thus, "[i]n the absence of an applicable exception, the foreign sovereign's immunity is complete — [t]he district court lacks subject matter jurisdiction over the plaintiff's case."  Id. (quoting Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 86 (D.C. Cir. 2005)) (internal quotation marks omitted) (alterations in original).  "The Act defines the term 'foreign state'

expansively. It includes not only foreign sovereigns, but also any 'political subdivision of a foreign state or an agency or instrumentality of a foreign state.' And the term 'agency or instrumentality of a foreign state' in turn covers any foreign corporation 'a majority of whose shares . . . [are] owned by a foreign state.' Because the [NPA] is wholly owned by the Liberian government, it qualifies as an 'agency or instrumentality,' and thus a 'foreign state' for subject-matter jurisdiction purposes." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811 (quoting 28 U.S.C. §§ 1603(a)-(b)) (citations omitted) (alterations in original).

The specific FSIA exception to sovereign immunity through which GSS travels is the so-called arbitration exception, which provides for jurisdiction over efforts to confirm arbitral awards that fall within, among other things, the scope of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention"). See 28 U.S.C. § 1605(a)(6)(B) ("A foreign state shall not be immune from the jurisdiction of courts of the United States . . . in any case . . . in which the action is brought [to enforce an arbitration agreement or award that] is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards . . . .").[2] Because the NPA was a signatory to the arbitration agreement with GSS, the NPA does not contest the Court's jurisdiction, pursuant to the arbitration exception, over the subject matter of the action against it. Nor does the NPA contest the existence of a statutory basis for asserting personal jurisdiction over it, as "under the FSIA, subject matter jurisdiction plus service of process equals personal jurisdiction." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811 (quoting Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 95 (D.C. Cir. 2002)) (internal quotation marks omitted). Rather, the jurisdictional disputes in this action concern

_____

[2]        As a substantive matter, GSS brings its petition pursuant to the Federal Arbitration Act, which incorporates the New York Convention. See 9 U.S.C. §§ 201-08.

(1) whether personal jurisdiction can *constitutionally* be exercised over the NPA, and (2) whether the FSIA's arbitration exception also provides subject matter jurisdiction over GSS's effort to hold Liberia — which was not a signatory to the agreement — responsible for payment of the award on the theory that the NPA served as Liberia's agent.

### B. The Court Lacks Personal Jurisdiction over the NPA

On GSS's first attempt to confirm its arbitral award, this Court dismissed the petition because it could not constitutionally exercise personal jurisdiction over the NPA. This holding turned on the conclusion that the NPA, although a wholly state-owned enterprise and therefore a "foreign instrumentality" under the FSIA, nonetheless possessed due process rights. GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 139-41. Accordingly, given the NPA's lack of minimum contacts with the United States, personal jurisdiction could not be asserted over it. Id. at 141. In its motion to alter or amend the judgment, GSS argued that the NPA warranted no due process protection because it had acted as Liberia's agent. GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 10. This argument found roots in the D.C. Circuit's decision in TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d 296 (D.C. Cir. 2005), where the court held that "[w]henever a foreign sovereign controls an instrumentality to such a degree that a principal-agent relationship arises between them, the instrumentality receives the same due process protection as the sovereign: none." GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 814-15 (citing TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d at 301-02). But GSS had failed to raise its agency argument in its opposition to the NPA's motion to dismiss, and, consequently, this Court determined that the argument had been waived under Rule 59(e) of the Federal Rules of Civil Procedure. GSS Group Ltd. v. Nat'l Port Auth., Dkt. No. 25, Civil Action No. 09-1322, at 10-12. On appeal, the D.C. Circuit noted that "Rule

59(e) motions are aimed at reconsideration, not initial consideration," and agreed with this Court's determination that GSS had waived its agency theory of personal jurisdiction.  GSS Group Ltd. v. Nat'l Port Auth., 680 F.3d at 811-13.

GSS now reasserts the same agency argument.  See Am. Pet. ¶¶ 17-35; Opp. at 13-14.  But the respondents maintain that collateral estoppel, or issue preclusion, "bars GSS from re-litigating whether the Court has personal jurisdiction over the NPA."  MTD at 34.  The doctrine of "[i]ssue preclusion applies '[w]hen an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment.'"  Menkes v. U.S. Dep't of Homeland Sec., 637 F.3d 319, 334 (D.C. Cir. 2011) (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982)) (second alteration in original).  GSS maintains that the issue presently before the Court is not the same as that which was "actually litigated and determined" in the prior action.  Specifically, it contends that "[t]he issue now in question is not the issue of personal jurisdiction, viewed broadly, but rather the narrower issue whether the NPA of Liberia is not sufficiently independent of Liberia to warrant possible due process protection."  Opp. at 13.

The question, then, is how to characterize the "issue" that was actually decided in the previous action.  The respondents argue for a broad view, contending that this Court in its previous decision "framed the issue as 'whether the Constitution permits the exercise of personal jurisdiction over the NPA.'"  Reply at 17 (quoting GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 137).  As noted, GSS argues for a much narrower definition of the issue previously decided, focusing on the precise grounds of the Court's conclusion that it lacked personal jurisdiction over the NPA — namely, that the NPA is more akin to a private corporation than a foreign government for Fifth Amendment purposes.  See Opp. at 13-14; GSS Group Ltd.

v. Nat'l Port Auth., 774 F. Supp. 2d at 141. On such a narrow view, GSS's argument would not be precluded, as this Court in its first ruling did not consider the specific legal theory now being pressed by GSS — that the NPA acted as Liberia's agent, thus stripping it of due process protection — because it had not been raised.

Our court of appeals has made clear, however, that "[a] new contention is not . . . necessarily a new issue" for purposes of issue preclusion analysis. Yamaha Corp. of America v. United States, 961 F.2d 245, 257 (D.C. Cir. 1992) (quoting JAMES WM. MOORE, JO DESHA LUCAS & THOMAS S. CURRIER, 1B MOORE'S FEDERAL PRACTICE ¶ 0.443[2] at 760-61 (1988)) (omission in original). Rather, "once an *issue* is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case." Id. at 254 (citing Securities Indus. Ass'n v. Board of Governors, 900 F.2d 360, 364 (D.C. Cir. 1990), and RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c).

The court of appeals in Yamaha applied this principle to hold that the appellant, Yamaha-America, was precluded from arguing that its trademark rights under the Lanham Act were violated by the importation of so-called "gray market" goods produced by Yamaha-Japan, where this ultimate issue had previously been decided against Yamaha-America in a decision by the Ninth Circuit. Yamaha Corp. of America v. United States, 961 F.2d at 256-58. Although in its second suit Yamaha-America sought to advance an argument that admittedly had not been considered by the Ninth Circuit — that the imported products bore physical differences from those sold by Yamaha-America in the United States — the D.C. Circuit held that because Yamaha-America could have presented evidence of physical differences to the district court in its first action, it was barred from doing so in its second lawsuit. As the court explained, "Yamaha-America failed properly to introduce evidence of 'physical differences' in the [first]

litigation, and it is precluded from relitigating the issue of its rights under [the Lanham Act] based on this 'new' evidence."  Id. at 258.

The D.C. Circuit relied on this same principle in Hall v. Clinton to conclude that where a court previously had determined that the Civil Service Reform Act "constituted the sole remedy for [the defendant's] conduct" — thus preempting the plaintiff's conspiracy claim under 42 U.S.C. § 1985 — the judgment precluded the plaintiff from bringing common law tort claims that had not been considered in the first action.  See Hall v. Clinton, 285 F.3d 74, 80-81 (D.C. Cir. 2002).  The court of appeals noted that "Hall's common-law tort allegations in this litigation are not new issues but simply new *legal theories*."  Id. at 81.  It explained that "[b]ecause [Hall's] contention that Clinton committed common-law torts against her is 'relevant to the issue[] that [was] litigated and adjudicated previously,'" she therefore was barred from relitigating the preemption issue.  Id. (quoting Yamaha Corp. of America v. United States, 961 F.2d at 257-58) (some alterations in original).

There are limits to this approach, of course.  "Once issue preclusion operates as to matters that merely 'should have been litigated,' . . . it becomes difficult to identify a useful distinction between the principles and purposes of issue preclusion and broader preclusion doctrines."  18 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE: JURISDICTION § 4417, at 431 (2d ed. 2002).  "Unchecked expansion of issue definition . . . may lead to unthinking preclusion on matters that should be tested against concepts of claim or defendant preclusion without any pretense that they have been litigated and resolved in a prior action."  Id. at 432.[3]  "The problem involves a balancing of important

---

[3]       The respondents have not argued for the application of claim preclusion, which, as noted by Wright, Miller, and Cooper, sweeps more broadly than does issue preclusion.  Under claim preclusion, as explained by our court of appeals, a subsequent lawsuit may be barred if it raises "the same claims or cause of action," where "there is an identity of the causes of action

interests: on the one hand, a desire not to deprive a litigant of an adequate day in court; on the

other hand, a desire to prevent repetitious litigation of what is essentially the same dispute."

RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c (discussing the "[d]imensions of an issue").

   The Restatement offers further guidance for situations where "there is a lack of

total identity between the particular matter presented in the second action and that presented in

the first," resulting in a need to determine whether "the 'issue' in the two proceedings is the

same." <u>See</u> RESTATEMENT (SECOND) OF JUDGMENTS § 27 cmt. c. Four factors are to be

considered: whether there would be "a substantial overlap between the evidence or argument"

advanced in the two actions; whether "the new evidence or argument involve[s] application of

the same rule of law as that involved in the prior proceeding"; whether "pretrial preparation and

discovery" in the first action might have "embraced the matter sought to be presented in the

second"; and the degree of relatedness between the claims in the two proceedings. <u>Id.</u>

   In GSS's first action before this Court, GSS neglected to argue that the NPA had

acted as Liberia's agent and therefore enjoyed no due process rights. When GSS did raise this

theory in its motion to alter or amend the judgment, this Court concluded that it had done so

belatedly and refused to consider the argument. <u>GSS Group Ltd. v. Nat'l Port Auth.</u>, Dkt. No.

25, Civil Action No. 09-1322, at 10-12. The D.C. Circuit agreed. <u>GSS Group Ltd. v. Nat'l Port

Auth.</u>, 680 F.3d at 811-13. It is clear, however, that GSS could have made the argument from

the outset, and that this legal theory is relevant to the issue that was in dispute in the first action

— namely, whether personal jurisdiction could be had over the NPA despite its lack of any

contacts with the United States. <u>See</u> <u>Yamaha Corp. of America v. United States</u>, 961 F.2d at

257-58. In addition, the last two Restatement factors support the application of issue preclusion

when the cases are based on the same nucleus of facts." <u>Capitol Hill Group v. Pillsbury,
Winthrop, Shaw, Pittman, LLC</u>, 569 F.3d 485, 490 (D.C. Cir. 2009) (internal quotation marks
omitted).

in these circumstances. The third factor essentially asks whether the plaintiff could be expected to have advanced the argument in the first action; as already explained, GSS could have done so, yet did not. And with respect to the fourth factor, the two actions here involve the exact same claim. In short, the fact that GSS enjoyed every opportunity to rely on a theory of agency when it earlier litigated the issue of personal jurisdiction over the NPA — yet, "[f]or unknown reasons . . . elected not to [make that argument]," GSS Group Ltd. v. Nat'l Port Auth., 774 F. Supp. 2d at 139 — warrants the application of issue preclusion to bar GSS from relitigating this issue.

In any event, as the remainder of this Opinion will explain, GSS's agency argument also fails on its merits. Therefore, even if GSS were not barred from advancing its agency theory as a basis for asserting personal jurisdiction over the NPA, the Court would still conclude that the NPA enjoys due process rights that, given its lack of any contacts with the United States, foreclose the exercise of personal jurisdiction over it.

### C. The Court Lacks Subject Matter Jurisdiction over GSS's Action Against Liberia

#### 1. Applicable Principles

Although GSS is barred from arguing that personal jurisdiction may be had over the NPA based on a theory of agency, the identical argument must be addressed in the context of GSS's effort to confirm the award against Liberia. This is because the test applied by the D.C. Circuit to determine when a foreign instrumentality loses due process protection, premised on the nature of its relationship to its parent government, see TMR Energy Ltd. v. State Property Fund of Ukraine, 411 F.3d at 301-02, applies equally to determine when an instrumentality's actions provide the basis for the exercise of subject matter jurisdiction, pursuant to the FSIA, over an action against the sovereign itself. See Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d 438, 445-49 (D.C. Cir. 1990).

The principle underlying this inquiry stems from the Supreme Court's decision in

First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983)

("Bancec"), where the Court held that "government instrumentalities established as juridical

entities distinct and independent from their sovereign should normally be treated as such."

Id. at 626-27. This presumption of independent status can be overcome in two circumstances:

(1) "where a corporate entity is so extensively controlled by its owner that a relationship of

principal and agent is created," id. at 629, and (2) where treating the instrumentality as an entity

distinct from its sovereign "would work fraud or injustice." Id. (quoting Taylor v. Standard Gas

Co., 306 U.S. 307, 322 (1939)).

The D.C. Circuit has further elucidated these two grounds for disregarding a

foreign instrumentality's independent status. The first ground — "the agency exception" — can

be founded on either of two different concepts: control or apparent authority. See Transamerica

Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 848-50 (D.C. Cir. 2000).[4] And the

concept of control is itself "relevant in two distinct contexts." Id. at 848. "First, control is

relevant when it significantly exceeds the normal supervisory control exercised by any corporate

parent over its subsidiary and, indeed, amounts to complete domination of the subsidiary." Id.

"Second, control is relevant when the sovereign exercises its control in such a way as to make

the instrumentality its agent; in that case control renders the sovereign amenable to suit under

ordinary agency principles." Id. at 849. As to the second point, the court in Transamerica

recognized that "[c]ourts have long struggled" to apply the principles of agency law, as "[t]he

---

[4] The court in Transamerica expressed "doubt, however, that a case of merely apparent authority falls within the agency exception — an exception limited by its terms to situations in which the instrumentality 'is so extensively controlled by [the sovereign] that a relationship of principal and agent is created.'" Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850 (quoting Bancec, 462 U.S. at 629) (alteration in original). Moreover, GSS advances no argument based on apparent authority; the Court therefore will not discuss the concept.

question [of how much control is required before parent and subsidiary may be deemed principal and agent] defies resolution by mechanical formula[e].” Id. (final alteration in original). In spite of these difficulties, the court of appeals nevertheless could “confidently state that the relationship of principal and agent does not obtain unless [1] the parent has manifested its desire for the subsidiary to act upon the parent's behalf, [2] the subsidiary has consented so to act, [3] the parent has the right to exercise control over the subsidiary with respect to matters entrusted to the subsidiary, and [4] the parent exercises its control in a manner more direct than by voting a majority of the stock in the subsidiary or making appointments to the subsidiary's Board of Directors.” Id. (citing RESTATEMENT (SECOND) OF AGENCY § 1 (1958)).

       The second ground for overcoming the presumption of independent status is where failure to do so would work a fraud or injustice. In Bancec, the Supreme Court applied this principle and held that the respondent's separate juridical identity should be disregarded. The case had been initiated by Bancec, a credit institution and instrumentality of the Cuban government, to collect on a letter of credit issued by First National City Bank (“Citibank”). Bancec, 462 U.S. at 613-14. Citibank counterclaimed and sought a setoff for the value of assets that had been seized by the Cuban government as part of a nationalization program. Id. The Supreme Court held that Bancec was not entitled to its presumption of independent status where it was clear that “the Cuban Government [itself] could not bring suit in a United States court without also subjecting itself to its adversary's counterclaim,” and where, due to the fact that “Bancec was dissolved even before Citibank filed its answer,” “the Cuban Government and [its central bank] . . . would be the only beneficiaries of any recovery.” Id. at 630-32. The Court explained that its decision resulted from “the application of internationally recognized equitable

principles to avoid the injustice that would result from permitting a foreign state to reap the

benefits of our courts while avoiding the obligations of international law." Id. at 633.

## 2. Analysis

Preliminarily, GSS argues that "the issue whether [] Liberia was the

principal of the NPA of Liberia is a mixed question of law and fact, and therefore cannot be

resolved on a Rule 12(b)(6) motion." Opp. at 2-3; id. at 13 ("GSS's petition and the additional

evidence provided by GSS in response to Respondents' motion are sufficient to raise a triable

issue concerning Liberia's control over the NPA."). Although GSS is correct to note that

resolution of this question turns on issues of fact, it is wrong to suggest that the respondents'

instant motion fails to provide the Court with an appropriate opportunity to address it. On a

motion to dismiss for lack of subject matter jurisdiction — which is brought under Rule 12(b)(1)

of the Federal Rules of Civil Procedure, not Rule 12(b)(6) — "where necessary, the court may

consider the complaint supplemented by undisputed facts evidenced in the record, or the

complaint supplemented by undisputed facts plus the court's resolution of disputed facts."

Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003) (quoting

Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992)).

More particularly, "to address a motion to dismiss under Rule 12(b)(1) where the

suit involves a foreign sovereign and the court's jurisdiction over the sovereign is contested, the

district court must do more than just look to the pleadings to ascertain whether to grant the

motion to dismiss," and the court therefore "has 'considerable latitude in devising the procedures

it will follow to ferret out the facts pertinent to jurisdiction.'" Foremost-McKesson v. Islamic

Rep. of Iran, 905 F.2d at 449 (quoting Prakash v. American Univ., 727 F.2d 1174, 1179 (D.C.

Cir. 1984)). In addition, "the *plaintiff* bears the burden of asserting facts sufficient to withstand a

motion to dismiss regarding the agency relationship."  Id. at 447.  Elsewhere in its brief, GSS

appears to concede this point by referencing its having served discovery requests and noticed

depositions aimed at "complet[ing] the record concerning Liberia's relationship with the NPA."

Opp. at 9.  If these efforts have produced any relevant information, GSS has not placed it before

the Court.  In any event, both parties have contributed to the construction of a factual record

concerning the relationship between Liberia and the NPA, and the Court will rely on that record

in evaluating whether it has subject matter jurisdiction over the action against Liberia.

   In its Amended Petition and its opposition brief, GSS contends that Liberia's

relationship to the NPA is characterized by the following links.  First, GSS asserts that the

NPA's board of directors "is wholly dominated and controlled by the President of Liberia."

Am. Pet. ¶ 17.  To support this assertion, GSS points out that the board's members are largely

appointed by the President of Liberia, and that among these members sit three government

ministers.  Id. ¶ 18.  Second, GSS contends that the economic interests of the NPA and the

Republic of Liberia are one and the same.  Id. ¶¶ 23-27.  Evidence of this alignment is said to be

found in the fact that "[t]he port infrastructure managed by the NPA of Liberia subject to

government oversight is critically important to Liberia's economic well-being."  Id. ¶ 23.  In

addition, the NPA is required to submit annual reports to the President, describing how "[its]

actions . . . fulfill its charter on Liberia's behalf."  Id. ¶ 25.  GSS further highlights the fact that

Liberia has absorbed some of the NPA's debts, as well as that "all of the NPA of Liberia's rights

and properties will vest in Liberia should the Liberian legislature terminate the NPA."

Id. ¶ 26-27.

   Third, GSS points to a 2010 Concession Agreement executed between the NPA

and APM Terminals Liberia, Ltd. — which, apparently, constitutes the port management

arrangement that superseded the cancelled GSS contract — executed "on behalf of the NPA" not only by the Chairperson of the NPA's board, but also by several government ministers and by Liberia's President herself. Am. Pet. ¶¶ 19-21. The Concession Agreement provides, in part, that "notices in respect of the NPA" be provided to these various officials. Id. ¶ 22. GSS contends that these factors present "compelling corroborating evidence that the Government of Liberia controls all important decisions on the part of the NPA of Liberia, including decisions on matters such as the Concession Agreement that are of critical importance to Liberia's economy." Opp. at 8.

Finally, GSS emphasizes the role that Liberia played in causing the NPA to breach its agreement with GSS. According to GSS, the NPA "cancelled the [agreement] acting under the control and direction, and pursuant to the instructions, of the NTGL, and hence Liberia." Am. Pet. ¶ 33. GSS argues that Liberia's having directed the NPA to cancel the deal demonstrates a level of control that satisfies the standard for "complete domination" and also satisfies the elements applicable under "ordinary agency principles." Opp. at 11. In addition, GSS contends that "not enforcing the award against Liberia would constitute manifest 'injustice' in circumstances where Liberia directed the NPA of Liberia to cancel the Contract." Id. at 12.

The respondents argue that none of these links establish that Liberia dominated the NPA or that the NPA acted as the government's agent under ordinary principles of agency law; they therefore maintain that the presumption of the NPA's independence must remain intact. MTD at 18-27; Reply at 1-13. The Court agrees. The facts cited by GSS do not demonstrate that the NPA was "so extensively controlled by [Liberia] that a relationship of principal and agent [was] created." See Bancec, 462 U.S. at 629. Nor does the record support a conclusion that recognizing the NPA as a distinct juridical entity would work an injustice.

For guidance, the Court looks to the D.C. Circuit's decision in Transamerica, where the court of appeals considered a litany of facts on which the district court had relied in concluding that a principal-agent relationship existed between Venezuela and its wholly-owned instrumentality, a shipping company called CAVN. The court of appeals determined, however, that this relationship was not close enough to overcome the presumption of CAVN's independent status. See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 847-54. The plaintiffs in Transamerica were a group of companies that had leased equipment to CAVN, and they alleged that CAVN breached its lease agreements when it failed to keep its payments current, eventually going bankrupt. Id. at 845-46. The action was brought against the government of Venezuela, which argued that its sovereign immunity insulated it from suit. Id. at 847. The plaintiffs contended that jurisdiction over the action was proper under the FSIA's commercial activity exception — the commercial activity being the contract and CAVN's alleged breach — on the theory that Venezuela exercised a sufficient degree of control over CAVN to render CAVN its agent. See id. at 845-47.

The district court in Transamerica had made five factual findings on which it based its conclusion that Venezuela was amenable to suit: "Venezuela (1) owned a majority of CAVN's stock; (2) appointed the Board of Directors and the Chairman of the Board and President; (3) was involved in CAVN's 'day-to-day' operations by overseeing the restructuring of CAVN's intermodal operations and approving the sale of three of CAVN's vessels; and (4) aided CAVN financially by allowing [another Venezuelan instrumentality] to enter into a trust agreement with CAVN; while (5) the President of CAVN, with apparent authority to bind Venezuela, assured one of the plaintiffs that the Government would support CAVN." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 850-51. The D.C. Circuit

methodically addressed each of these findings and explained why "the facts as found, considered as a whole, establish[ed] neither that Venezuela dominated CAVN nor that CAVN was Venezuela's actual or apparent agent." Id. at 851.

The court of appeals acknowledged that facts one and two — establishing that Venezuela owned a majority of CAVN's stock and that it controlled the composition of the board — were "relevant," but "as a matter of law [they did] not by themselves establish the required control." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851 (citing Foremost-McKesson, Inc. v. Islamic Rep. of Iran, 905 F.2d at 448). As to the third set of facts found by the district court, the Circuit disagreed with the court's assessment that these facts demonstrated Venezuela's control over CAVN's day-to-day operations. With respect to the board's appointment of a Venezuelan naval officer as chief of CAVN's new "Intermodal Division," the court viewed this as "describ[ing] nothing more than the sole shareholder exercising its influence, through the Board of Directors, to put its own chosen manager in charge . . . and leaving to him the task of running 'day-to-day' operations." Id. As to the finding that "Venezuela [had] authorized the sale of three of CAVN's vessels," id., the court of appeals made two points. First, it noted that "the sale of a portion of its fleet as part of a massive restructuring hardly qualifies as CAVN's 'day-to-day' business." Id. Second, it observed that such authorization might have been provided by Venezuela not as shareholder, but rather as government regulator. Id.

The fourth set of findings made by the district court related to Venezuela's "financial involvement" with its instrumentality. Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851-52. The district court found that Venezuela had provided capital infusions into CAVN and had created a trust agreement under which CAVN was beneficiary, all

to enable CAVN to "satisfy its debts and attain liquidity." Id. at 852. But the court of appeals cited Bancec for the proposition that government appropriations to instrumentalities constitute "a normal aspect of the relation between a government and a government-owned corporation, not an instance of 'day-to-day' involvement in the affairs of the corporation." Id. The fifth factual finding related to a theory of apparent authority that is not relevant to the present inquiry, as GSS has not advanced such an argument here.

This Court will likewise consider each of GSS's proffered facts in turn. First, GSS points out that the NPA's board is composed almost entirely of appointees of the President of Liberia. Although governmental control of the board is relevant, it is far from dispositive, as GSS acknowledges. See Opp. at 8 (citing Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851. And as in Transamerica, "the remaining factors do not make up the shortfall." See Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851.

GSS next contends that "the NPA of Liberia's economic interests are Liberia's economic interests." Am. Pet. at 6. But this characteristic likely describes virtually all state-owned enterprises; governments establish instrumentalities such as the NPA precisely to achieve the economic goals of the state. See Bancec, 462 U.S. at 624-25 (noting that the "distinctive features [possessed by] government instrumentalities . . . frequently prompt governments in developing countries to establish separate juridical entities as the vehicles through which to obtain the financial resources needed to make large-scale national investments"). If this were not so, governments would not expend funds from the public fisc to keep these enterprises capitalized — something that Liberia has done for the NPA, and which "reflect[s] only a normal relationship between a sovereign and an instrumentality of the state." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 852 (citing Bancec, 462 U.S. at 624). Similarly,

the Court fails to see how the fact that the NPA's assets would vest into Liberia's possession upon the NPA's dissolution proves anything more than that it is a state-owned entity. Indeed, that its property would vest in the state *upon its dissolution* only underscores that the NPA presently holds title to its own property.

GSS also points to the 2010 Concession Agreement between the NPA and another port terminal operator, which was signed by several Liberian government officials and which includes provisions requiring that "notices in respect of the NPA" be provided to the government. Am. Pet. ¶¶ 19-22; Opp. at 8. First, as the respondents argue, the nature of the NPA's relationship to its parent government with respect to a contract executed several years after the transaction at issue cannot shed light on any relationship of agency that may have existed when GSS and the NPA entered into their own agreement. See MTD at 22 n.13; Reply at 12-13. Moreover, even if the 2010 agreement were relevant, GSS fails to offer any persuasive argument as to how the government's co-signing the contract and its being kept apprised of "notices in respect of the NPA" demonstrate the sort of extensive control necessary to disregard the NPA's distinct corporate identity.

Finally, GSS emphasizes the fact that the NPA cancelled its agreement with GSS at the direction of the Chairman of the National Transitional Government of Liberia. See Am. Pet. ¶¶ 28-35; Opp. at 3-6, 10-12. According to GSS, the fact that the Liberian government directed the NPA to cancel the contract demonstrates a level of control sufficient to render Liberia amenable to suit under each of the "distinct contexts" recognized by the D.C. Circuit in Transamerica: complete domination and ordinary principles of agency law. See Opp. at 11. In addition, GSS contends that even if this Court were to disagree with its arguments under the agency exception, Liberia would still be amenable to suit because "not enforcing the award

against Liberia would constitute manifest 'injustice' in circumstances where Liberia directed the NPA of Liberia to cancel the Contract." Id. at 12. On each of these points, however, GSS offers almost nothing in the way of argument or citation to authority to explain how this one instance of control satisfies the standard set out in Bancec, a standard which demands a showing of "extensive[] control[]" to overcome the presumption that the NPA's independent status should be respected. See Bancec, 462 U.S. at 629. Rather, GSS states in conclusory fashion that complete domination is "evident here in Liberia's direction that the NPA of Liberia cancel the Contract," and that "[t]here is also no serious question" that Liberia's action satisfies the "conventional principal-agent standard with the 'principal having the right to control the conduct of the agent with respect to the matter entrusted'" to it. Opp. at 11. (quoting Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 849) (internal quotation marks omitted).

Complete domination results where a sovereign's control over an instrumentality "significantly exceeds the normal supervisory control exercised by any corporate parent over its subsidiary," such that "the sovereign and the instrumentality are in those circumstances not meaningfully distinct entities; they act as one." Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 848. But as the preceding analysis has demonstrated, GSS has not shown anything approaching such domination of the NPA by Liberia — which might entail, for example, the government's management of day-to-day "routine business decisions," see id. at 853 — and the single example of control at issue here cannot alter that conclusion.

As to "ordinary agency principles," GSS's argument hinges on the third element identified by the court in Transamerica, namely that the principal possess the right to control its agent's conduct with respect to the matter entrusted to it. See Opp. at 11. The "matter" entrusted to the NPA for purposes of this analysis, GSS appears to contend, is the execution of

the specific contract at issue here.  See id. at 6.  But again, GSS offers no reasoning or authority

to elucidate why this one instance of control should suffice to give rise to an agency relationship

between Liberia and the NPA.  In addition, GSS fails to explain how the first two elements of the

principal-agent standard have been met on these facts; indeed, there is no indication that

"[Liberia] manifested its desire for [the NPA] to act upon [its] behalf" in engaging a new port

manager, nor that the NPA "consented so to act."  See Transamerica Leasing, Inc. v. La

Republica de Venezuela, 200 F.3d at 849; see also id. at 853 ("Venezuela did not evince an

intent to have CAVN act as its agent in dealing with the plaintiffs.").  In fact, the course of

events preceding the NTGL's direction to cancel the deal demonstrates that the NPA acted

independently in negotiating and executing the contract with GSS, pursuant to its mission and in

exercise of the legal rights endowed to it by its organic statute.

      Moreover, the letter sent to the NPA by the Chairman of Liberia's transitional

government, directing that the contract be cancelled, appears more likely to be an instance of the

sovereign acting as government regulator rather than as corporate parent.  See Transamerica

Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 851 (recognizing this distinction, and

stating that "it is not uncommon for a government — as regulator, not as shareholder — to

require approval for certain transactions in the transportation sector").  As the record evidence in

this case demonstrates, the NTGL's direction that the NPA cancel its deal with GSS arose from a

course of events in which Liberia's Contract and Monopolies Commission first halted the

contract for violation of competitive bidding regulations and later granted an exemption from

these rules.  But after the amended agreement came under further scrutiny from Liberia's

transitional government and its international advisors, the contract was ordered to be cancelled,

with instructions that the NPA's future efforts to engage a port manager be conducted in

accordance with competitive bidding and other relevant regulatory standards. These circumstances bear the hallmarks of a government exercising its regulatory authority to ensure conformity to law, rather than those of a shareholder conducting business through an agent who acts on the shareholder's behalf and subject to its plenary control.

Finally, GSS offers a single sentence of support for its argument that failure to hold Liberia to account for the NPA's breach would work an injustice, given that the contract's cancellation was ordered by the Liberian government. Opp. at 12. Injustice has been found to result where a foreign sovereign intentionally seeks to gain a benefit while using the corporate status of its instrumentality as a shield to guard against concomitant costs or risks, see Bancec, 462 U.S. at 630-33, where a sovereign otherwise unjustly enriches itself through the state-owned enterprise, see Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d at 854, or where a sovereign uses a state-owned corporation to defeat a statutory policy. See id. It is not at all apparent that any of these conditions is present on the facts of this case, and GSS has put forth no argument to the contrary.

### III.  CONCLUSION

Because this Court cannot constitutionally exercise personal jurisdiction over the NPA, GSS's petition with respect to it must be dismissed.  In addition, because the Republic of Liberia is entitled to sovereign immunity, GSS's effort to confirm its arbitral award against Liberia fails for lack of subject matter jurisdiction.  Accordingly, GSS's Amended Petition for an Order Confirming Foreign Arbitral Award is dismissed in its entirety.  An appropriate Order accompanies this Opinion.


/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  March 11, 2014